1
2
3
4
5                        UNITED STATES DISTRICT COURT
6                        EASTERN DISTRICT OF WASHINGTON

7    Estate of BLAIR AUSTIN NELSON,
     deceased, by and through PAUL              NO. 2:22-CV-0308-TOR
8    NELSON individually and as
     Personal Representative,                   ORDER GRANTING IN PART
9                                               DEFENDANTS' MOTION TO
                            Plaintiff,          STRIKE AND DENYING
10                                              DEFENDANTS' MOTION FOR
                                                SUMMARY JUDGMENT
11          v.

12   CHELAN COUNTY, Washington, a
     municipal corporation; d/b/a
13   CHELAN COUNTY REGIONAL
     JUSTICE CENTER; CHRISTOPHER
     SHARP; and KAMI ALDRICH,
14   L.P.N.,

15                          Defendants.

16

17          BEFORE THE COURT are Defendants' Motion to Strike (ECF No. 32) and

18   Defendants' Motion for Summary Judgment (ECF No. 15).  The Court has

19   reviewed the record and files herein, determined that oral argument is unnecessary

20   in this matter, and is fully informed.  For the reasons discussed below, Defendants'

     ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
     DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 1

Motion to Strike (ECF No. 32) is GRANTED in part and Defendants' Motion for

Summary Judgment (ECF No. 15) is DENIED,

## BACKGROUND

This matter arises out of the medical treatment of Ms. Blair Nelson, a 42-

year-old woman who was in the custody of the Chelan County Regional Justice

Center ("CCRJC") when she died on November 21, 2021.  ECF No. 26 at 8.  The

Wenatchee Police Department arrested Ms. Nelson on November 20, 2021, for

suspicion of Driving Under the Influence.  ECF No. 16 at 3.  At the time of her

arrest, Ms. Nelson agreed to submit to a portable breath test, which recorded a

reading of 0.256 blood alcohol level.  *Id*. at 4.  She was then taken to the CCRJC

for DUI processing, but because the breath samples taken upon her arrival recorded

above 0.250, per jail policy, she was transported to Central Washington Hospital to

be medically cleared before booking.  *Id*.  During her emergency room visit, Ms.

Nelson indicated that while she was not in any pain, she was routinely drinking 70

shots of liquor per week.  *Id*. at 5.  She was treated by Dr. John Crane for a

contusion above her eye, and after submitting a breathalyzer test with a 0.249

result, was medically cleared for jail.  *Id*. at 6.  Upon her discharge, she was sent

with instructions for the onset for withdrawal symptoms, which included, "[c]all

your doctor now or seek immediate medical care if: You have trembling,

restlessness, sweating, and other withdrawal symptoms that are new or that get

worse." ECF No. 26 at 3.

Relevant for the facts of the matter moving forward, CCRJC relies on a combination of Lexipol Policies, which are a national set of policies for corrections practice, to provide a framework for operation. ECF No. 19 at 3. The pertinent provisions at issue here are Lexipol Policy 711 and Policy 717. The Court does not have before it a formal copy of Lexipol Policy 711, and instead must rely on parties' retelling of the contents, which the Court understands to mean that individuals who are brought to the facility in need of emergency medical attention are required to be taken promptly to a medical facility. ECF No. 19-1 at 23. It appears that was accomplished, as Ms. Nelson was taken to a hospital prior to booking.

Lexipol Policy 717 deals with detoxification and withdrawal. Policy 717.1 states that "newly incarcerated individuals may enter the facility while under the influence of a substance or they may develop symptoms of alcohol or drug withdrawal. This policy is intended to ensure that the staff is able to recognize the symptoms of intoxication and withdrawal from alcohol or drugs" for appropriate medical treatment. ECF No. 30-10 at 2. Policy 717.2 requires that staff "respond promptly to medical symptoms presented by inmates" because withdrawal can be life-threatening. *Id*. And Policy 717.5 requires that:

> Inmates who are observed experiencing severe, life-threatening intoxication (overdose) or withdrawal symptoms will be promptly seen

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 3

by a physician or referred to an off-site emergency facility for treatment
. . . If the qualified health care professional determines that an inmate
is at risk for progression to a more severe level of withdrawal, the
inmate will be appropriately housed in an area where he/she can be kept
under constant observation by qualified health care professionals or
trained correctional staff.

*Id*. at 3.

Additionally, CCRJC has its own internal policy regarding withdrawal
which states, among other things, that an assessment for withdrawal should be
conducted "when an inmate reports a history of alcohol and/or withdrawal or is
identified by staff as having potential for alcohol withdrawal if known history or
alcohol use . . . or if the inmate has a high index of suspicion for potential
withdrawal." ECF 30-16 at 8. After withdrawal treatment has begun, inmates will
be "monitored in medical observation by staff until stable and cleared by medical
staff." *Id*.

After being medically cleared by the hospital, Ms. Nelson was then
transported back to CCRJC in the early hours of November 21, 2021 and filled out
a Medical Screening Form upon her arrival. ECF No. 16 at 6–7. Because of the
early hour, she was observed by Corrections Deputy Christopher Norse rather than
a medical professional at her initial medical intake.[1] *Id*. at 8. Ms. Nelson told

---

[1] CCRJC does not have a 24-hour medical staff, instead the on-site nurses begin
work sometime around 6 a.m. ECF No. 26 at 10. CCRJC instead relies on non-

Deputy Norse that she would be "detoxing from alcohol," and Deputy Norse

checked a box stating that Ms. Nelson appeared "under the influence of alcohol,"

and made a note that she would be withdrawing from alcohol on the Medical

Receiving Screening Form. ECF No. 26 at 10. All other boxes on the form were

checked "no," and Deputy Norse noted that Ms. Nelson was not currently

displaying withdrawal symptoms. ECF No. 16 at 7. Deputy Norse then provided

Ms. Nelson with a pitcher of Gatorade, and placed her in a holding cell at 3:14 a.m.

*Id*. at 7–8. He then deposited all of Ms. Nelson's screening paperwork in a box for

medical staff to review when they arrived for their shift. *Id*. at 8. There is no

surveillance video of her time in the holding cell. ECF No. 26 at 10.

        Ms. Nelson was moved from the holding cell to a private cell at 6:25 a.m.

*Id.* From this point onward, parties generally disagree on many of the material

facts. Defendants assert that Ms. Nelson was properly monitored by correction

staff between 7:45 a.m. and 11:38 a.m., as evidenced by the surveillance footage of

her cell. *Id*. During that time, according to Defendants, Ms. Nelson was altogether

peaceful, sleeping comfortably and showing no sign of agitation. *Id*. at 9. Plaintiff

asserts that because no check was performed on Ms. Nelson, despite the presence

_____

medical staff to do after hour intake and requires that they be trained via Lexipol

Policy 711 and Lexipol Policy 717.

of medical staff during this time, there is no way to substantiate the statement that

she was not distressed based on surveillance footage. ECF No. 26 at 3. Further,

while Defendants state that Ms. Nelson used the phone and walked without trouble

during this time, Plaintiff asserts that she did have difficulty and agitation using the

telephone in her cell and was having difficulty reaching anyone on the other end.

ECF Nos. 16 at 8 and 26 at 3.

At approximately 12:15 p.m., two corrections deputies entered Ms. Nelson's

cell to distribute her lunch. ECF No. 16 at 9. Ms. Nelson was unable to stand to

retrieve her sack lunch and had visible tremors. ECF No. 26 at 11. Because she

"was not doing well," and the correction officers suspected alcohol withdrawal,

they alerted LPN Kami Aldrich, a member of CCRJC's medical staff. *Id.* LNP

Aldrich examined Ms. Nelson at 12:25 p.m., and based on her agitation, anxiety,

nausea, and "severe tremors," gave her a Clinical Institute Withdrawal Assessment

("CIWA") score of 10 or 11. ECF Nos. 16 at 11 and 26 at 13. The parties disagree

as to whether LPN Aldrich meant to categorize the tremors as "severe," but

Plaintiff offers that the shaking was so apparent that LPN Aldrich was unable to

take Ms. Nelson's blood pressure and persisted even when the arms were relaxed

rather than raised. ECF Nos. 16 at 11, ¶ 47 and 26 at 12, ¶¶ 21– 22. Based on the

CIWA assessed score of at least 10, CCRJC's internal policy either permitted or

required LNP Aldrich to take certain action, including administering Tylenol,

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 6

Librium, thiamine, and folic acid.[2]  ECF Nos. 16 at 11, ¶¶ 45–46 and 26 at 13, ¶ 25.  Plaintiff asserts that LPN Aldrich did not contact a medical provider as is required by the internal policy, and likewise administered a "loading dose" of 100 milligrams of Librium, twice the permitted amount.  ECF No. 26 at 13, ¶¶ 26, 28.  Defendants dispute this contention, asserting that LPN Aldrich did in fact contact a medical provider, though Plaintiff disputes this fact as no documentation exists showing contact with a provider.  ECF No. 28 at 7.  Librium is a narcotic and can result in oversedation which in turn may compromise respiration due to its interaction with the liver.  ECF No. 26 at 13, ¶¶ 29–30.  According to Plaintiff, LPN Aldrich had to steady Ms. Nelson's hands to administer the medications due to her shaking.  *Id*. at 14, ¶ 32.

---

[2] CCRJC's internal policy requires that after a CIWA is completed, inmates shall be subject to monitoring by medical staff until cleared.  ECF No. 30-16.  Provision two of the Alcohol Withdrawal Policy states that Thiamine, Folic Acid, and Tylenol "may be initiated," for inmates with a potential for or active withdrawal.  *Id*.  However, provision three has no modifier, and instead simply states "[f]or a CIWA score of [greater than] 8 start Librium and contact provider."  *Id*.  Medical staff is permitted to dose 50 milligrams of Librium every 6–12 hours on the first day.  *Id*.

1    LPN Aldrich left Ms. Nelson's cell at 12:29 p.m.  ECF No. 26 at 12, ¶ 19.

2    Defendants assert that Ms. Nelson made two phone calls outside of her cell, and

3    returned at 12:44 p.m., appearing without any major withdrawal symptoms.  ECF

4    No. 16 at 12, ¶¶ 49–50.  After interacting with a corrections officer, who stated that

5    she "appeared fine," Ms. Nelson laid down in her bunk, and was observed reaching

6    for what appeared to be a tissue that she placed in her mouth at 12:45 p.m.  *Id*. at

7    13, ¶ 53.

8    Both parties agree at 12:58 p.m., Ms. Nelson experienced a noticeable

9    movement.  ECF Nos. 16 at 13, ¶ 54 and 26 at 15, ¶ 36.  Defendants insist that Ms.

10   Nelson's movement was comprised of four separate myoclonic movements,

11   indicating cardiac arrest, rather than a tonic-clonic seizure as demonstrated in

12   alcohol withdrawal.  ECF No. 16 at 13–14, ¶¶54–55.  Plaintiff maintains that Ms.

13   Nelson experienced a seizure.  ECF No. 26 at 15, ¶ 36.  Both parties agree that

14   there was no more movement from Ms. Nelson until she was found dead in her cell

15   at 5:17 p.m.  ECF Nos. 16 at 14, ¶ 56 and 26 at 16, ¶ 41.  Plaintiff asserts that in

16   the hours between 12:58 p.m. and 5:17 p.m., Ms. Nelson was not placed on

17   medical monitoring, per jail protocol, received no additional assessment for

18   medical staff, and received inadequate check-ins from non-medical jail staff, thus

19   no one was alerted to the fact that she was in distress.  ECF No. 26 at 15–16, ¶¶

20   39–40.  Further, according to Plaintiff, LPN Aldrich falsified Ms. Nelson's medical

documentation, recording that 50 milligrams of Librium was administered between 8 a.m. and 11 a.m., and that another 50-milligram dose was given between 1 p.m. and 3 p.m., rather than one "loading dose" around 12:25 p.m. *Id*. at 14, ¶ 34. Defendants assert that adequate check-ins were performed, and at all times Ms. Nelson was monitored by video surveillance. ECF No. 15 at 6.

Jail staff was unable to wake Ms. Nelson for dinner at 5:17 p.m. ECF No. 16 at 14, ¶ 56. Resuscitation of Ms. Nelson was called off at 5:28 when she was pronounced dead. ECF No. 17 at 9. Rigor mortis had set in. ECF No. 26 at 16, ¶ 41. An autopsy was performed, and parties disagree as to its specific findings. The autopsy report states that the cause of death is "chronic ethanolism with steatohepatitis, dilated cardiomyopathy, and probable withdrawal." ECF No. 20-5 at 1. At her deposition, the medical examiner who performed the autopsy stated that in her opinion, the ultimate cause of death was chronic alcoholism. ECF No. 30-8 at 4. When asked, the medical examiner discussed the possibility that Ms. Nelson's death could have been caused by alcohol withdrawal, fatty liver (steatohepatitis), or dilated cardiomyopathy individually, or in some combination, as each is a symptom of chronic ethanolism. ECF No. 20-4 at 23.

Plaintiff brought this lawsuit on behalf of Ms. Nelson's estate, claiming negligence and a violation of 42 U.S.C. § 1983 against Chelan County Jail Director Christopher Sharp, LPN Kami Aldrich, and Chelan County under a *Monell* theory

of liability.  Defendants brought a Motion for Summary Judgment and

subsequently a Motion to Strike Plaintiff's expert witnesses attached to the

Response to the Motion for Summary Judgment.  ECF Nos. 15 and 32.

## DISCUSSION

### I.    Motion to Strike

Defendants request the Court strike the testimony given from three of

Plaintiffs' expert witnesses: Dr. Richard Cummins, Dr. Lori Roscoe (PhD), and

Catherine Fontenot, prior to considering the Motion for Summary Judgment.  ECF

No. 33 at 2.  Expert testimony is admissible if it meets the standards set forth in

Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if: (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue; (b) the testimony is based on sufficient facts or data; (c)
> the testimony is the product of reliable principles and methods; and (d)
> the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702.

In addition to specific issues with each expert, Defendants take umbrage

with all three witnesses' reference to the September 7, 2021, death of Joseph A.

Verville.  ECF No. 33 at 4, 6, 7.  Mr. Verville was booked into CCRJC on

September 5, 2021, with noted signs of opioid withdrawal.  ECF No. 1 at 18; ECF

No. 21 at 10, ¶ 41. LPN Aldrich first assessed him for withdrawal and gave detox medications at dinner the following evening, September 6. *Id*. Surveillance footage showed Mr. Verville vomiting at least six times after taking the withdrawal medication, but he was not assessed again by medical staff until he was found dead at 8:50 a.m. on September 7. *Id*. at 8; ECF No. 26 at 17. After his death, LPN Aldrich was notified of potential discipline on September 27, 2021, and was given a verbal warning on November 23, 2021, after the death of Ms. Nelson. *Id*. at 19. Defendants object to the expert testimony inclusion of Mr. Verville's death as impermissible character evidence. ECF No. 33 at 5. Plaintiff asserts that each of the expert witnesses can discuss the death of Mr. Verville because it establishes a notice of a pattern of conduct by CCRJC, Director Sharp, and LPN Aldrich. ECF No. 42 at 4.

On summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court must only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "A district court's rulings on the admissibility of expert testimony ... will be reversed only if 'manifestly erroneous.'" *United States v. Cazares*, 788 F.3d 956, 976 (9th Cir. 2015). In considering whether expert testimony is based on a sufficient foundation, the Court performs a "gate-keeping" role by evaluating the

1  relevance and reliability of all expert testimony, and examining whether the

2  testimony offered is "scientific." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

3  137, 147 (1999).  While "[a]n opinion is not objectionable just because it embraces

4  an ultimate issue," Federal Rule of Evidence 704(a), "an expert witness cannot

5  give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of

6  law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017).

7       In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

8  Supreme Court identified four non-exclusive factors that may be helpful to the

9  court in assessing the relevance and reliability of expert testimony, including (1)

10 whether a theory or technique has been tested; (2) whether the theory or technique

11 has been subjected to peer review and publication; (3) the known or potential error

12 rate and the existence and maintenance of standards controlling the theory or

13 technique's operation; and (4) the extent to which a known technique or theory has

14 gained general acceptance within a relevant scientific community.  *Id*. at 593–94.

15      However, the *Daubert* factors do not constitute a "definitive checklist or

16 test." *Id*. at 150.  Indeed, the court's fundamental objective is to generally evaluate,

17 based on whatever factors are important to the particular case, the relevancy and

18 reliability of the testimony and not necessarily to explore factors that might not be

19 relevant to a particular case, such as whether the expert's methods are subject to

20 empirical testing.  *Id*. at 151.  The proponent has the burden of establishing that the

pertinent admissibility requirements have been met by a preponderance of the evidence.  Fed. R. Evid. 104.

### A. **Dr. Richard Cummins**

Dr. Cummins is a Washington State licensed medical doctor who is board certified in both internal medicine and emergency medicine.  ECF No. 27 at 6.  Dr. Cummins has been a member of the University of Washington Department of Internal Medicine and Emergency Medicine since 1981, when he became an attending physician.  *Id*.  He was promoted to full professorship in 1985 where he remained for 28 years until retiring from clinical work in July 2020 to Professor Emeritus.  *Id*.  During his tenure at the University of Washington Medical Center, he practiced and taught other physicians in the field of emergency medicine, as well as supervised nurses, medical students, and residents in training.  *Id*.  Over the course of his career, Dr. Cummins has authored more than 150 articles and book chapters on emergency care, including cardiac care.  *Id*.

Dr. Cummins reviewed the entire case file, including medical reports, video footage, discovery related documents, and deposition transcripts.  ECF No. 27 at 8.  In doing so, he determined that CCRJC has a substandard training program and procedures in place which led to; failure to medically assess Ms. Nelson when she was booked into jail, failure to follow the internal alcohol withdrawal policy, and failure to provide a proper level of assessment, monitoring, and care.  *Id*. at 15.  Dr.

1    Cummins determined that had CCRJC rectified any of the failures in care, Ms.

2    Nelson would not have died.  *Id.*

3         Defendants assert that Dr. Cummins is not qualified to give expert testimony

4    on the operations of medical procedures inside a corrections facility because his

5    experience is with emergency departments in hospitals.  ECF No. 33 at 3–4.

6    Defendants also object to Dr. Cummins statements on the basis that he is offering

7    impermissible character evidence in his discussion of LPN Aldrich's conformity

8    with past negligence, which is inadmissible character evidence.  *Id.* at 4.  Finally,

9    Defendants argue that Dr. Cummins should not be able to opine on causation

10   relating to the practice of jail staff and the death of Ms. Nelson.  *Id.*  Plaintiff

11   asserts, in part, that Dr. Cummins is not offering opinions about the correction

12   facility's practices, but whether or not a standard of medical care was met while

13   Ms. Nelson was incarcerated, and therefore is within his sphere of expertise.  ECF

14   No. 42 at 7.  As to impermissible character evidence, Plaintiff offers that Dr.

15   Cummins' opinion is valid under Federal Rule of Evidence 404(b)(2) as evidence

16   of a notice, pattern of conduct, knowledge, or absence of mistake.  *Id.* at 17.

17   Further, Plaintiff asserts that Dr. Cummins is allowed to opine on the ultimate issue

18   of causation per Federal Rule of Evidence 704(a) and provides testimony in the

19   same scope as Defendants' experts.

20        First, the Court finds that Dr. Cummins is qualified to give an expert opinion

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 14

on medical care, given his "knowledge, skill, experience, [and] education[.]"

*Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153 (E.D. Wash. 2009).

Despite the fact that Nelson's death took place in a corrections facility rather than a hospital, Dr. Cummins has extensive knowledge of treating patients in various stages of medical stability, including alcohol withdrawal, given his career in the emergency department. *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (finding that an expert's experience in a field but lacks particularized knowledge in the specific facts of a case, goes to the weight of the testimony rather than the admissibility of the expert opinion). He is qualified to discuss how and when medication should be administered, and allowed to give his opinion about the initial medical intake and ongoing monitoring of inmates who are under the care of jail medical staff. *Edmo v. Corizon, Inc*., 935 F.3d 757, 786 (9th Cir. 2019) (internal citations omitted) ("Accepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable."). While Dr. Cummins is not necessarily familiar with medical practices in a correctional facility, he is familiar with the standard practice regarding medical care for individuals receiving treatment for alcohol withdrawal.

As an expert witness, Dr. Cummins is permitted to testify on causation. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237–38 (9th Cir. 2017) ("That

1    defendants may be able to offer other equally qualified medical opinion opposing

2    causation also does not support the idea that *Daubert* should bar the admission of

3    the testimony of the doctors offered as experts by Plaintiffs.  Instead, the testimony

4    of [both expert doctors] should have been admitted as expert testimony under

5    Federal Rules of Evidence 702.").  Based on his own medical background and

6    review of the record, Dr. Cummins's opinion on the ultimate issue, that Ms.

7    Nelson's death was caused by failure in treatment for alcohol withdrawal

8    syndrome, is permissible.

9         Next, Defendants assert that Dr. Cummins' testimony amounts to

10   impermissible character evidence, based on his comparison of the facts at hand

11   with the death of Mr. Verville.  ECF No. 33 at 4.  Specifically, Defendants assert

12   that Dr. Cummins' report draws a comparison between Nurse Aldrich's treatment

13   of Ms. Nelson and the treatment of Mr. Verville, improperly concluding that Nurse

14   Aldrich has a propensity to behave in a medically negligent manner.  *Id*. at 5.

15   Plaintiff asserts that a comparison is not offered in violation of Federal Rule of

16   Evidence 404(b), but instead is offered to show a pattern of administering lower

17   than the established standard of care to inmates, or lack of knowledge or mistake

18   that a particular mode of operation would result in the death of an inmate under the

19   care of CCRJC.  ECF No. 42 at 17–18.

20        In relevant part, Rule 404(b) provides that, "[e]vidence of any other crime,

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 16

wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Dr. Cummins' report references the Verville incident twice, and not in great detail. ECF No. 27 at 8 and 12.  The second reference in the report does seem to suggest that a connection is being drawn between the incident involving Nelson and the incident involving Mr. Verville:

> Note that two months earlier 38-year-old Joseph A. Verville also died in custody at the Chelan County Regional Justice Center. Like Blair Nelson he was under the care of Kami Aldrich, LPN.

ECF No. 27 at 12.

While this evidence could be construed as character evidence suggesting that jail medical staff may have engaged in substandard care, the Court agrees that evidence of Mr. Verville's death, and the circumstances surrounding it, are indicative of lack of mistake or absence of notice.  Regardless, under Federal Rule of Evidence 703, a court is vested with the discretion to allow otherwise inadmissible facts or data if the "probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

Here, CCRJC's internal policy requires a specific assessment and monitoring framework for inmates withdrawing from alcohol dependence and opioid dependence.  ECF Nos. 30-10 at 2 and 30-16 at 8.  Though not completely analogous, the inclusion of the similar circumstances surrounding Mr. Verville's

death may be indicative of absence of mistake or lack of accident via

noncompliance with the internal protocol, which would result in the death of an

unmonitored detoxing inmate.  Fed. R. Evid. 404(b)(2).  The Lexipol policy lists

alcohol withdrawal and drug detox under the same heading, requiring an inmate

experiencing either to be under "constant observation."  ECF No. 30-10 at 3.

Because Dr. Cummins is an expert being offered to opine on the standard of

medical care provided by CCRJC and the potential cause of Ms. Nelson's death,

the Court declines to strike his expert testimony as it does not amount to

impermissible character evidence.

### B. **Dr. Lori Roscoe, PhD**

Dr. Roscoe is a Certified Correctional Health Professional and a Certified

Correctional Health Professional – Registered Nurse.  ECF No. 28 at 4.  Dr.

Roscoe holds a bachelor's degree in education, a bachelor's degree in nursing, a

master's degree in public administration with a healthcare concentration, a

master's degree in nursing, a Doctorate Degree in Healthcare Administration, and a

Doctor of Nursing Practice degree.  *Id*.  She began work in correctional healthcare

in 1995 and today is the principal of Correctional HealthCare Consultants LLC and

The Correctional Nurse LLC.  *Id*.  Dr. Roscoe holds an active registered nurse

license in the states of Florida, California, Washington, and Georgia, and is

licensed as a nurse practitioner in Florida, California, Virginia, Georgia, and

Kentucky.  *Id.*  Over the course of her nearly 30-year career, Dr. Roscoe has worked in a variety of correctional center settings relating to healthcare.  *Id.*

Dr. Roscoe reviewed much of the information currently in the record, including the Chelan County Coroner Report, medical documents, the Complaint, discovery related information, and depositions.  ECF No. 28 at 5–6.  Based on this review, she determined that Ms. Nelson received substandard nursing care.  *Id.* at 11–12.  As part of her finding, she determined that LPN Aldrich's administration of 100 milligrams of Librium without consulting a provider was illegal but opines no further on this statement except to state that it deviates from the scope of practice of a licensed practical nurse.  *Id.* at 9–10.  She also included Mr. Verville's death in determining that CCRJC has a substandard practice of care based on its failure to take corrective action after Mr. Verville's death.  *Id.* at 11.

Defendants assert that Dr. Roscoe's testimony that LPN Aldrich "illegally" administered Librium without contacting a medical provider should be disregarded pursuant to Rule 401 and 403.  ECF No. 33 at 6.  Further, Defendants allege that her discussion of Mr. Verville amounts to character evidence and is therefore inadmissible.  *Id.*  Plaintiff argues that Dr. Roscoe's discussion of Mr. Verville's death is admissible for many of the same reasons as discussed under Dr. Cummins, and that her characterization of the Librium dose as "illegal" is factual and should therefore be permitted.  ECF No. 42 at 21–22.

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 19

As an expert on nursing practice, Dr. Roscoe is permitted to opine on whether the standard of care administered from a nursing perspective. Much like Dr. Cummins, the Court finds that her discussion on the treatment received by Mr. Verville is relevant to Plaintiff's argument that CCRJC's medical care of inmates is substandard. Fed. R. Evid. 704(a).

As to her statement that LPN Aldrich's administration of Librium was illegal, Plaintiff offers additional support that any nurse would understand that they are not permitted to administer the narcotic without first contacting a provider. ECF No. 28 at 9–10 ("When LPN Aldrich decided to administer 100 mg of Librium, double the protocol dose, without consulting a provider, she was acting far beyond her scope of practice as an LPN and illegally . . . The administration of 100 mg of Librium at that time significantly deviated from the standard of nursing care and the decision by LPN Aldrich to do so greatly exceeded the scope of practice of a licensed practical nurse."). Federal Rule of Evidence 401 states that evidence is relevant if, "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." And Rule 403 states that a Court may exclude evidence if it presents the danger of, "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." While potentially dangerous, against the stated internal policy, and seemingly in a

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 20

1    general lexicon of knowledge that it should not be done, Plaintiff offers no

2    additional information that administering Librium without first contacting a doctor

3    is "illegal."  As such, the Court shall disregard the notion that LPN Aldrich's

4    conduct was "illegal" based on Dr. Roscoe's testimony, because Plaintiff has

5    provided no additional information to support this statement.  However, the rest of

6    her report is admissible.

7    **C. <u>Catherine Fontenot</u>**

8            Ms. Fontenot is the Director of the Reception and Diagnostic Unit for

9    VitalCore Health Strategies and was retained for her expertise in correctional

10   practice.  ECF No. 29 at 5.  Ms. Fontenot has had a lengthy career in the field of

11   corrections.  She obtained her Bachelor of Science in criminal justice in 1992 and

12   has worked in a variety of correctional settings since that time.  *Id*. at 4.  Ms.

13   Fontenot obtained her master's degree in criminology from Grambling State

14   University in 2006, and became an adjunct professor at various institutions,

15   teaching courses covering Criminal Law, Criminalistics, Emergency Management,

16   Criminology, Juvenile Justice, Corrections Process, Drugs and Substance Abuse,

17   and the Death Penalty.  *Id*. at 5.  In her current role, Ms. Fontenot was hired to

18   streamline the inmate intake process and to implement an evidence-based health

19   and safety classification.  *Id*.

20           In reaching her conclusion surrounding this case, Ms. Fontenot reviewed

1    much of the record, including the Complaint, medical records, discovery materials,

2    and deposition transcripts. ECF No. 29 at 5–9. She ultimately determined that

3    CCRJC was not proactive in rectifying standards of care that led to the death of

4    Mr. Verville, and these gaps in care led to the death of Ms. Nelson. *Id*. at 29.

5          Defendants' object to the inclusion of Ms. Fontenot's testimony because it

6    alleges her testimony is based on medical information, impermissible under

7    Federal Rule of Evidence 702 based on her background. ECF No. 33 at 7. They

8    also allege that the language used, and the conclusions drawn run afoul of the

9    character evidence requirement under Federal Rule of Evidence 401 and 402. *Id*.

10   Instead, Defendants urge that the Court look to a report prepared by its expert on

11   correctional facility practice, Penny Bartley, which refutes much of the contents of

12   Ms. Fontenot's report. ECF No. 19-1 at 28–37. Plaintiff contends that Ms.

13   Fontenot's testimony is not being offered for a medical purpose, but instead is

14   offered to demonstrate best corrections practices against the opinion of

15   Defendants' expert witness. ECF No. 42 at 22. Plaintiff also rejects the

16   characterization of Ms. Fontenot's report as containing "personal attacks." *Id*. at

17   23.

18         First, the Court determines that Ms. Fontenot is permitted to provide expert

19   testimony in the field of correctional practices per Federal Rule of Evidence 702.

20   Not only has she provided similar expert testimony in other legal matters, but her

education, experience, and training in the field, including her extensive background

in both academia and in a correction setting, provides a foundation for her

perspective on what constitutes safe and effective jail practices.  ECF No. 29 at 4–

5.  As demonstrated both by Defendants' own expert witness and additional filings,

many times jail officials without a formal medical background must nevertheless

be able to render rudimentary care, including identifying withdrawal symptoms,

and continued monitoring of inmates.  ECF Nos. 19 at 5, 19-1 at 19–20, 23, 24.

The facts of this case demonstrate that in a jail system, staff must work together to

keep everyone safe, inmates and each other alike, and as such non-medical staff is

asked to do initial medical intake of inmates after hours and provide ongoing

monitoring to recognize withdrawal and alert medical staff.  *Id*.; ECF No. 29 at 13.

In this spirit, the Court determines that no part of Ms. Fontenot's opinion runs

afoul of Rule 702.  She does not make a medical diagnosis of withdrawal beyond

the scope of what would have been asked of officials without a medical

background working in the jail and recognizes the difference between medical and

non-medical staff.  ECF No. 29 at 15.

Further, while the language used by Ms. Fontenot is passionate at times, it is

not excludable under Federal Rule of Evidence 403.  Many of the facts discussed

by all of Plaintiff's expert witnesses are disputed by Defendants' expert witnesses.

The solution to this predicament is not to strike the expert testimony, but rather it

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 23

1    should be subjected to "vigorous cross-examination, presentation of contrary

2    evidence, and careful instruction on the burden of proof" for a jury determination.

3    *Daubert*, 509 U.S. at 596.

4        With the exception of Dr. Roscoe's reference to the administration of Librium

5    being "illegal," Defendants motion to strike is denied.

6    **II.    Motion for Summary Judgment**

7        Defendants move for summary judgment because they allege that Plaintiff

8    will be unable to satisfy the requirements of 42 U.S.C. § 1983, both Director Sharp

9    and LPN Aldrich are entitled to qualified immunity, and that the County cannot be

10    held liable under a *Monell* theory of liability given the facts of this case.  ECF No.

11    15 at 5, 11, 14, 15.

12        Summary judgment may be granted to a moving party who demonstrates

13    "that there is no genuine dispute as to any material fact and the movant is entitled

14    to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the

15    initial burden of demonstrating the absence of any genuine issues of material fact.

16    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the

17    non-moving party to identify specific facts showing there is a genuine issue of

18    material fact.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

19    "The mere existence of a scintilla of evidence in support of the plaintiff's position

20    will be insufficient; there must be evidence on which the [trier-of-fact] could

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 24

1   reasonably find for the plaintiff." *Id*. at 252.

2       For purposes of summary judgment, a fact is "material" if it might affect the

3   outcome of the suit under the governing law. *Id*. at 248. A dispute concerning any

4   such fact is "genuine" only where the evidence is such that the trier-of-fact could

5   find in favor of the non-moving party. *Id*. "[A] party opposing a properly

6   supported motion for summary judgment may not rest upon the mere allegations or

7   denials of his pleading but must set forth specific facts showing that there is a

8   genuine issue for trial." *Id*. (internal quotation marks omitted); *see also First Nat'l*

9   *Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 288-89 (1968) (holding that a party

10  is only entitled to proceed to trial if it presents sufficient, probative evidence

11  supporting the claimed factual dispute, rather than resting on mere allegations). In

12  ruling upon a summary judgment motion, a court must construe the facts, as well

13  as all rational inferences therefrom, in the light most favorable to the non-moving

14  party, *Scott v. Harris*, 550 U.S. 372, 378 (2007), and only evidence which would

15  be admissible at trial may be considered, *Orr v. Bank of Am., NT & SA*, 285 F.3d

16  764, 773 (9th Cir. 2002).

17      **A.    Section 1983 Claims Against Individual Defendants**

18      Defendants assert that summary judgment is warranted with respect to LPN

19  Aldrich because she behaved objectively reasonably and provided adequate

20  medical treatment of Ms. Nelson. ECF No. 15 at 14. Further, they argue that both

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 25

LPN Aldrich and Director Sharp should be entitled to qualified immunity. *Id*. at 13.

To make a claim under § 1983 a plaintiff must show that (1) a person acting under color of state law (2) committed an act that deprived the plaintiff of some right, privilege, or immunity protected by the Constitution or laws of the United States. *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988). Pretrial detainees have a constitutional right to adequate medical care while in the custody of the government and awaiting trial. *Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022). When a violation implicates a pretrial detainee's Fourteenth Amendment right to adequate medical care, the Ninth Circuit requires the claim to be evaluated under an objective deliberate indifference standard. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1068 (9th Cir. 2016). In the context of the Fourteenth Amendment, a plaintiff making a claim for inadequate medical treatment via failure to protect must show "more than negligence but less than subjective intent—something akin to reckless disregard." *Id*. at 1071 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). The elements required to show violation of a pretrial detainee's Fourteenth Amendment Due Process rights by failure-to-protect against individual officers include:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering

serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

The third element regarding whether the defendant's actions were objectively unreasonable is an inquiry that will "turn on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (internal citation omitted).

However, qualified immunity shields government actors from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). On summary judgment, a court examines whether a state official is entitled to qualified immunity by determining (1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was "clearly established at the time of the violation." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019).

1    *1. LPN Aldrich*

2        With respect to the § 1983 claim against LPN Aldrich, Defendants assert

3    that all the care Ms. Nelson received was objectively reasonable, especially in light

4    of her discharge from the Central Washington Hospital and subsequent appearance

5    at CCRJC without apparent withdrawal symptoms.  ECF No. 15 at 5–6.  Further,

6    according to Defendants, LPN Aldrich followed proper CIWA protocol and

7    administered an appropriate standard of care, including providing a "loading dose"

8    of Librium, and simply made a mistake diagnosing the tremors experienced by Ms.

9    Nelson as "severe."  The reasonableness of LPN Aldrich was assessed by

10    Defendants' expert witnesses, Dr. Jared Strote and Nurse Billye Tollackson, in

11    their review of the surveillance footage and related material.  *Id*. at 7–8.

12        Plaintiff asserts that LPN Aldrich's failure to assess Ms. Nelson until her

13    tremors were "severe," general failure to follow CCRJC's withdrawal protocol,

14    and failure to provide medical monitoring after administering medication, all

15    amount to inadequate medical treatment.  ECF No. 25 at 6–7.  When viewed in the

16    light most favorable to Plaintiff, reasonable minds could differ as to whether or not

17    LPN Aldrich acted with reckless disregard in her treatment of Ms. Nelson.

18        As to the four factor tests detailed in *Castro v. County of Los Angeles* for

19    determining a violation of the Fourteenth Amendment, LPN Aldrich made several

20    decisions with respect to Ms. Nelson's care while confined, including choosing to

1    see her six hours after beginning her shift or while performing "med pass" at 9:30

2    a.m., dosing 100-milligrams of Librium, and then failing to provide medical

3    monitoring.  ECF No. 26 at 11, 13, 14.

4         Second, reasonable minds could differ, evidenced by dueling expert

5    witnesses, as to whether this conduct put Ms. Nelson at risk of medical

6    complications.  Nurse Roscoe, expert witness for Plaintiff, maintains that LPN

7    Aldrich fell below the requisite standard of care at several points, including failing

8    to visit Ms. Nelson's cell after reviewing her intake paperwork, failing to

9    accurately document her treatment of Ms. Nelson, and failing to provide

10   appropriate medical monitoring given the CIWA policy.  ECF No. 28 at 8–11.  In

11   contrast, Nurse Billye Tollackson, expert witness for Defendants, provided

12   testimony that based on Ms. Nelson's presentation without withdrawal symptoms

13   at the time of her intake after discharge from the hospital, LPN Aldrich saw her at

14   an appropriate time.  ECF No. 21 at 4, 6.  LPN Aldrich administered the

15   appropriate medication per jail protocol, and Ms. Nelson did not appear on video

16   surveillance to be in distress after care was given.  *Id*. at 7–8.

17        As to the third element, whether LPN Aldrich's actions were reasonable

18   with respect to the care provided, critical facts are still in dispute because it is not

19   readily apparent that she followed internal CCRJC's protocol.  Such facts,

20   discussed at length *supra*, include: whether LPN Aldrich was required to evaluate

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 29

Ms. Nelson when she arrived for her shift, whether she should have and did not call a provider to discuss her withdrawal symptoms, and whether Ms. Nelson was appropriately monitored after withdrawal protocol was initiated.  This is weighed in light of the additional circumstances, including Ms. Nelson's discharge from the Central Washington Hospital as fit for jail, the missing footage of her demeanor in the holding cell between the hours of 3 a.m. and 6:30 a.m. on November 21, 2021, Ms. Nelson's general state before, during, and after being treated for withdrawal, and LPN Aldrich's decision not to place Ms. Nelson on a heightened level of medical monitoring.  ECF Nos. 16 at 6, 26 at 4; *compare* ECF Nos. 27 at 20, 28 at 7, and 20-5 at 2 ("I placed a BP (Blood Pressure) wrist cuff around her wrist but due to the tremors it was unable to get [a] reading") *with* 17-1 at 4 and 21 at 6.

And the fourth factor, whether Defendant caused her injuries, is highly contested by both parties and is made no clearer by the autopsy report which listed the cause of death as "chronic ethanolsim with steatohepatitis, dilated cardiomyopathy, and probable withdrawal."  ECF No. 20-5 at 1.  The medical examiner who performed the autopsy stated each symptom of chronic alcoholism could have independently or jointly have caused Ms. Nelson's death.  ECF Nos. 20-4 at 31–32 and 30-8 at 13–14.  Plaintiff's medical expert, Dr Cummins, has testified that on a more probable than not basis, that Ms. Nelson's death was caused by the onset of alcohol withdrawal, and seems to suggest this could have

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 30

been further complicated by respiratory distress due to a negative interaction with the dose of Librium.[3] ECF No. 27 at 10, 18. Defendants' two expert witness reach separate conclusions from each other, and from Dr. Cummins. Dr. Jared Strote found on a more probable than not basis that Ms. Nelson's death was caused by cardiac arrest. ECF No. 17 at 8. And Dr. Carl Wigren found that Ms. Nelson's death was caused by hypoxia (a lack of oxygen to the brain) caused by heart contraction due to cardia arrhythmia which in turn was caused by either fatty liver disease or dilated cardiomyopathy. ECF Nos. 18 at 5, 18-1 at 7, and 38-8 at 10.

Nevertheless, Defendants assert that summary judgment is still proper because qualified immunity applies. At step one, the Court assesses whether or not there is a triable issue of fact as to whether a constitutional violation has been committed. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). As discussed above, the Court determines that a jury may find that LPN Aldrich's medical care was inadequately performed with reckless disregard, because many of the key facts are still in dispute.

The second prong of the qualified immunity test is whether every reasonable

---

[3] The Court once again notes that the autopsy did not reveal that Ms. Nelson died from a Librium overdose but did reveal a diseased liver as a side effect from overuse of alcohol. ECF No. 20-4 at 29.

1    official in the same position as the defendant would understand that the conduct

2    was unlawful in the situation she was confronted with.  *Taylor v. Barkes*, 575 U.S.

3    822, 824 (2015) (per curiam) (holding that for qualified immunity purposes, law is

4    "clearly established" if "every reasonable official would have understood that what

5    he is doing violates th[e] right"); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657,

6    678 (9th Cir. 2021).  Stated another way, a right is clearly established for qualified

7    immunity purposes if "it would be clear to a reasonable [prison official] that [her]

8    conduct was unlawful in the situation he confronted' ... or whether the state of the

9    law [at the time of the alleged violation] gave 'fair warning' to [her] that [her]

10   conduct was unconstitutional."  *Clement v. Gomez*, 298 F.3d 898, 906 (9th

11   Cir.2002) (internal citation omitted).  Here, Plaintiff must show that a reasonable

12   nurse would have understood that failing to assess Ms. Nelson for potential

13   withdrawal in a timely manner when medical shifts begin at 6 a.m., failing to

14   properly assess and document her interaction with Ms. Nelson, failing to contact a

15   provider based on withdrawal symptoms, and failing to provide substantive

16   medical monitoring after providing withdrawal medication, "presented such a

17   substantial risk of harm to [Ms. Nelson] that the failure to act was

18   unconstitutional."  *Horton*, 915 F.3d at 600.

19        As a preliminary matter, pretrial detainees have a constitutional right to

20   adequate medical care while in the custody of the government and awaiting trial.

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 32

*Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022); *Sandoval*, 985 F.3d at 667.

The Ninth Circuit has held that prison officials violate the Constitution when they

"deny, delay, or intentionally interfere" with medical treatment, *Jett v. Penner*, 439

F.3d 1091, 1096 (9th Cir. 2006), or when the official's chosen treatment is

"medically unacceptable under the circumstances," *Snow v. McDaniel*, 681 F.3d

978, 988 (9th Cir. 2012) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.

1996)).  A lack of exact factual similarity is no bar to the establish that notice of a

constitutional right exists in a given situation.  *Wilk v. Neven*, 956 F.3d 1143, 1148

(9th Cir. 2020) (internal citations omitted).  However, "for a right to be clearly

established, existing precedent must have placed the statutory or constitutional

question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per

curiam) (internal citation omitted).  Precedent in this area casts a wide net and

includes instances of subpar medical attention which resulted in death, as well as

instances involving treatment of less than life threatening ailments, as

constitutionally deficient medical care.  *See Gordon v. Cnty. of Orange*, 6 F.4th

961, 970, 72 (9th Cir. 2021) (finding a pre-trial detainee has a right to medical

screening and direct view safety checks); *Clement*, 298 F.3d at 905 (finding that

denying inmates a shower and medical attention for four hours after being exposed

to pepper spray while in confinement was clearly established as unconstitutional).

In viewing the facts in the light most favorable to Plaintiff, LPN Aldrich's

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 33

care of Ms. Nelson could be described as both delayed and medically

unacceptable, given the internal withdrawal policy of CCRJC that she purportedly

did not follow.  Plaintiff points to *Norman v. Wellpath, LLC*, No. 3:19-CV-02095-

MO, 2022 WL 1516262, at *13 (D. Or. May 13, 2022), a recently decided case

from the District of Oregon, which is instructive but not binding.  *Norman*

involved a pre-trial detainee who died in custody from "complications of chronic

beverage alcohol use."  *Id*. at *2.  Notable for the matter at hand, the deceased,

who was discharged from a hospital, refused treatment after a medical evaluation

from the nurse on duty.  The nurse then contacted a doctor per jail protocol and

received the instruction to "wait until morning" to assess her vital signs due to the

amount of medication she had received at the hospital.  The deceased was then

placed on medical monitoring and received check-ins roughly every 45 minutes

and was constantly monitored through a security camera.  During the night, the

deceased rolled off her bed, landing face down on the floor, and was found dead 20

minutes later.  *Id*.

While not entirely analogous because the nurses involved did not assert

qualified immunity, *Norman* is helpful in its discussion of the right to direct-view

safety check-ins recognized in *Gordon v. County of Orange,* 6 F.4th at 973.  As

applied to this case, the Court in *Gordon* stated:

> Thus, at the time of the incident, Gordon had a clearly established
> constitutional right to have a proper medical screen conducted to ensure

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 34

1
2
3

the medically appropriate protocol was initiated. As applied here, [a nurse] acted as gatekeeper by serving as the screening nurse and was therefore responsible for identifying an inmate's urgent medical needs. Whether she failed to do so is properly considered under the first prong of the qualified immunity analysis.

4    *Id*. at 971–72.

5    Additionally, *Gordon* instructed that pre-trial detainees have a right to

6    direct-view safety checks sufficient to determine whether their presentation

7    indicates the need for medical treatment, and further held "law enforcement and

8    prison personnel should heed this warning because the recognition of this

9    constitutional right will protect future detainees."  6 F.4th at 973.  Further, the

10   court in *Norman* found that "a reasonable jury could find that that [the nurse in

11   question] violated [the deceased's] rights by failing to put her on a closer watch."

12   No. 3:19-CV-02095-MO, 2022 WL 1516262, at *17.  While not exactly on point,

13   the Court is satisfied based on the information as presented, that Ms. Nelson was

14   entitled to be properly screened and watched while experiencing withdrawal and

15   notice of this right was indicated on her intake form.  ECF No. 20-3 at 1 ("Stated

16   that she will withdrawal from alcohol").  A nurse in LPN Aldrich's place would be

17   on notice and understand that failure to administer proper care, akin to what is

18   described in the internal CCRJC's policy of monitoring, would result in the

19   violation of a pre-trial detainee's Fourteenth Amendment right, and ultimately lead

20   to injury or death.  Thus, she is not entitled to qualified immunity for summary

judgment purposes.

In sum, as to Plaintiff's § 1983 claim against LPN Aldrich, material facts are still in dispute and thus the Court cannot grant summary judgment.  Nor does qualified immunity entitle her to summary judgment.

### 2. Chelan County Jail Director Christopher Sharp

Next, Defendants allege that Director Sharp either cannot be found liable under § 1983 or is entitled to qualified immunity because he had no interaction with Ms. Nelson while she was in the custody of CCRJC.  ECF No. 15 at 13.  In addition to a lack of direct involvement, Defendants also assert Plaintiff has failed to show that Director Sharp was deliberately indifferent via a failure to train theory, which provides that under § 1983, a supervisor can be held liable for a subordinate's violation if: " '[his] own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'"  *Starr v. Baca*, 633 F.3d 1191, 1195 (9th Cir.), *withdrawn and superseded on denial of reh'g en banc*, 652 F.3d 1202 (9th Cir. 2011) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991).  Defendants assert that Director Sharp took meaningful steps after the death of Mr. Verville to provide an updated policy surrounding fentanyl withdrawal, including "jail checks," and that LPN Aldrich behaved appropriately

in response to Ms. Nelson's symptoms.  ECF No. 35 at 8.  Plaintiff asserts that

Director Sharp did not provide proper training and failed to meaningfully

reprimand LPN Aldrich after the death of Mr. Verville.  ECF No. 25 at 10.

Under § 1983, a supervisor cannot be held liable under *respondeat superior*.

*Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020).  Instead, a

plaintiff's claim must show that a supervisor exercised deliberate indifference in

the training or supervision of an employee, amounting to a constitutional violation.

*Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City

of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  As part of this

demonstration, a plaintiff must show that the supervisor disregarded known gaps in

a training program that would cause employees to violate constitutional rights, or

the gaps must obviously lead to constitutional violations.  *Connick v. Thompson*,

563 U.S. 51, 61 (2011) (internal citation omitted).  Or, a supervisor may be held

liable for the actions of an employee under § 1983 if he or she knew of the

employee's violations and failed to act to prevent them.  *Maxwell v. Cnty. of San

Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (internal citation omitted).  A plaintiff

must show that the supervisor was deliberately indifferent to the need of employee

training, and that the inaction of the supervisor was the moving force behind the

constitutional violation.  *See Flores*, 758 F.3d at 1159; *Oviatt By & Through

Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

1    The Court cannot determine that summary judgment is proper as to Director

2    Sharp's failure to train LPN Aldrich.  A supervisor may be held liable in an

3    individual capacity for his "own culpable action or inaction in the training,

4    supervision, or control of his subordinates." *Watkins v. City of Oakland, Cal*., 145

5    F.3d 1087, 1093 (9th Cir. 1998).  Defendants first argue that Director Sharp did not

6    approve of any delay in medical care because LPN Aldrich responded

7    appropriately to Ms. Nelson's symptoms.  ECF No. 35 at 7.  However, the internal

8    policy states that inmates at risk of experiencing withdrawal shall be seen

9    "promptly," and Ms. Nelson was not seen until almost six hours after LPN Aldrich

10   began her shift, and then never reassessed again.  ECF No. 30-10 at 3.  And

11   Plaintiff's contention that LPN Aldrich did not respond appropriately to Mr.

12   Verville's detox but was still not instructed on internal CCRJC policies after his

13   death, lends to argument that Director Sharp was aware of training flaws and chose

14   inaction regarding inmates Fourteenth Amendment right to adequate medical

15   treatment.  ECF No. 25 at 10.  And, though new policies were put in place,

16   Plaintiff asserts that LPN Aldrich and the rest of the medical staff should have

17   been retrained after the death of Mr. Verville, and LPN Aldrich stated she was not.

18   ECF Nos. 25 at 19 and 30-15 at 17.  There is no suggestion that members of

19   medical staff were aware of the expectations under the new policies at the time of

20   Ms. Nelson's death, or if the new policies addressed the cause of Mr. Verille's

death in custody.  The Court agrees that reasonable minds could differ as to

Director Sharp's knowledge of the need for retraining, and therefore declines to

grant summary judgment.

Defendants contend that even if Director Sharp can be held liable under

§ 1983, he is nevertheless shielded by qualified immunity.  ECF No. 33 at 7.

Having already established that a triable issue of fact remains as to Director

Sharp's supervisor liability under § 1983, the Court next considers the second

prong of the qualified immunity test, whether the right "was clearly established at

the time of the violation." *Sandoval*, 985 F.3d at 671.  The Court concludes that,

pursuant to the discussion surrounding LPN Aldrich *supra*, should a trier of fact

determine that Director Sharp failed to provide adequate training and supervision

to CCRJC medical staff, the right to adequate medical care via monitoring was

established at the time of violation.  *Gordon*, 6 F.4th at 970, 73.  Therefore,

Director Sharp is not entitled to qualified immunity at this time.

## B.    *Monell* Liability Against Chelan County

Finally, Plaintiff seeks to hold Chelan County liable under § 1983 for its

ratification of a policy of failure to train staff to treat and monitor inmates for detox

or withdrawal.  ECF No. 25 at 17.  Defendants argue that Chelan County had in

place appropriate policies for addressing withdrawal and detox, and they were

followed.  ECF No. 15 at 15.  Further, it asserts that the death of Mr. Verville

1  cannot be used to establish a pattern or practice for the purpose of *Monell* liability.

2  *Id*. at 16; ECF No. 35 at 8.

3       A municipality cannot be held liable under § 1983, except if a plaintiff can

4  prove that it has a policy or custom which led to a constitutional violation.  *Monell*

5  *v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  Under a

6  *Monell* framework, a plaintiff must demonstrate: (1) he or she had a constitutional

7  right of which he was deprived; (2) the municipality had a policy; (3) the policy

8  amounts to deliberate indifference to his constitutional right; and (4) "the policy is

9  the moving force behind the constitutional violation." *Dougherty v. City of*

10  *Covina*, 654 F.3d 892, 900 (9th Cir. 2011).  There are three ways a plaintiff may

11  satisfy the *Monell* policy requirement: first, a government may act pursuant to an

12  expressly adopted policy, second a government may act pursuant to a

13  "longstanding practice or custom," *Thomas v. County of Riverside*, 763 F.3d 1167,

14  1170 (9th Cir. 2014), and third, the person who commits the constitutional

15  violation acts as a final governmental policymaker or such an official "ratified a

16  subordinate's unconstitutional decision or action and the basis for it." *Clouthier v.*

17  *County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010).  Here, Plaintiff is

18  arguing that Chelan County either has a practice of failing to train staff, or that it

19  ratified constitutional violations of medical staff by failing to retrain and

20  reprimand.  ECF No. 25 at 16.

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 40

1    As to a standing policy or custom, Plaintiff argues that Chelan County

2    offered no training to ensure that staff follow the internal policies of alcohol

3    withdrawal and detox, including training regarding medical monitoring. *Id*. at 18–

4    19.  A failure to train may be the basis for *Monell* liability if it amounts to

5    deliberate indifference. *City of Canton*, 489 U.S. at 388.  To demonstrate a

6    deliberate indifference, a plaintiff must show that the choice was a conscious one

7    in the decision not to train as it relates to the relevant constitutional violation,

8    which can be satisfied by an obvious need for training that is lacking. *Price v.*

9    *Sery*, 513 F.3d 962, 973 (9th Cir. 2008) ("[The failure to train standard is]

10   objective in that it does permit a fact finder to infer 'constructive' notice of the risk

11   where it was 'obvious'—but this is another way of saying that there needs to be

12   some evidence that tends to show a conscious choice.").  In general, a failure to

13   train claim must contain; (1) the deprivation of a constitutional right, (2) a showing

14   that the municipality had a training policy that amounts to deliberate indifference

15   to the constitutional rights of those with whom officials are likely to come into

16   contact; and (3) a showing that the constitutional injury would have been avoided

17   had the municipality properly trained those officers. *Blankenhorn v. City of*

18   *Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (internal citations and quotation marks

19   omitted).  However, the practice or custom must be founded upon sufficient

20   frequency and consistency, isolated or sporadic incidents of violation are

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 41

1    insufficient.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (internal citations

2    omitted).

3          Plaintiff posits that the County did not provide proper training to CCRJC

4    staff on internal policies regarding withdrawal and detox, based on the failure of

5    staff to respond appropriately to Ms. Nelson and Mr. Verville per those policies.

6    ECF No. 25 at 18–19.  This is further supported, according to Plaintiff, by a lack of

7    proper protocol regarding video monitoring, evidenced by the fact that the only

8    official policy describes video monitoring for the purpose of security and

9    communication, but does not explicitly mention medical monitoring.  *Id*.; ECF No.

10   30-21 at 2.  Defendants argue that Chelan County had in place proper Lexipol

11   policies on withdrawal and detox, and that Plaintiff cannot show deliberate

12   indifference based on a failure to train.  ECF Nos. 15 at 12 and 35 at 9.

13         Having decided that the prior incident involving the death of Mr. Verville is

14   admissible for purposes of demonstrating a practice or custom, the Court cannot

15   determine that summary judgment is proper as to the *Monell* claim against Chelan

16   County.  For one, Defendants have produced no internal training or policy

17   regarding video medical monitoring, despite stating that inmates with medical

18   concerns are monitored this way.  ECF No. 15 at 13.  Further, there is no indication

19   that there is a requirement that an CCRJC official in charge of the monitoring be

20   medically trained, nor does it appear, based on Chelan County's 30(b)(6)

1    deposition, that the monitoring is consistently done by the same person or

2    particularly conducive for proactive monitoring.  ECF No. 30-6 at 4–5 ("Basically

3    I could be [in the control room] for five minutes while the individual goes to the

4    bathroom.  I could try to give them a 15-minute break occasionally.") ("I can see

5    movement, but if somebody is covered up, I cannot tell . . . if they're just sleeping.

6    I cannot tell how they're doing specifically. The cameras are not that good as I

7    cannot tell you . . . if she is breathing right now, I could not tell because she's

8    about right here.").  This is also set against the backdrop of Plaintiff's contention

9    that Mr. Verville vomited at least ten times while in custody, six of those times

10    occurred after he was provided medication, yet was provided no additional

11    assessment by medical staff.  ECF No. 26 at 17.  Further, Plaintiff and Defendants

12    disagree about the effectiveness of video monitoring and the type of cell checks

13    Ms. Nelson received after the administration of her withdrawal medication.  ECF

14    Nos. 15 at 6, 25 at 16, 19-1 at 7, and 30-13 at 4.

15         Defendants' expert on correctional practices discussed that an internal

16    investigation after the death of Ms. Nelson revealed that staff was confused about

17    the internal policy regarding proper cell checks.  ECF No. 19-1 at 27.  And it

18    appears that, even if the jail staff understood part of the internal cell check policy,

19    that both deputies were to enter the cell, and perform a check at least every 60

20    minutes, staff did not perform this function for either Mr. Verville or Ms. Nelson.

1    ECF Nos. 20-18 at 9–12 (describing how deputies "briefly looked" into Ms.

2    Nelson's cell, and LPN Aldrich did not visit during a 2:29 p.m. "Medical Pass")

3    and 30-20 at 6–9.

4         LPN Aldrich also failed to follow internal protocol with regard to Mr.

5    Verville and Ms. Nelson.  Plaintiff contends that internal jail protocol would have

6    required both Mr. Verville and Ms. Nelson to be seen by medical staff "promptly"

7    based on their respective reports that withdraw or detox may be a possibility but

8    were not seen until their symptoms had become severe.  Additionally, Plaintiff

9    contends that both individuals should have been placed on heightened monitoring

10   based on their condition, which was not done in either case.  ECF No. 25 at 8.

11        The above-described conditions within CCRJC leave triable issues of fact

12   for a jury to consider.  Reasonable minds could differ as to whether Chelan County

13   was deliberately indifferent to obvious gaps in training, as first demonstrated by

14   the death of Mr. Verville, and ultimately led to violations of Ms. Nelson's

15   Fourteenth Amendment right to adequate medical care.  As such, summary

16   judgment is not proper with respect to the *Monell* liability of Chelan County.

17        **C.    <u>Negligence Claim Against All Defendants</u>**

18        Plaintiff argues that the same foundation that supports the constitutional

19   claim brought against each defendant may also support a claim of negligence.

20   ECF No. 25 at 20.  Defendants argue that there was no breach of duty, in that Ms.

1  Nelson at all times had access to adequate medical care, and that nothing CCRJC

2  did or failed to do caused Ms. Nelson's death.  ECF No. 15 at 16–17.

3  As is well known, the elements of negligence are duty, breach, causation,

4  and damage or injury.  *Hartley v. State*, 103 Wash. 2d 768, 777 (1985).

5  Washington law requires that the breach be the proximate cause of the injury,

6  meaning that it is both the cause in fact and the legal cause.  *Id*. (internal citation

7  omitted).  "Breach and proximate cause are generally fact questions for the trier of

8  fact.  However, if reasonable minds could not differ, these factual questions may

9  be determined as a matter of law."  *Hertog, ex rel. S.A.H. v. City of Seattle,* 138

10  Wash. 2d 265, 275 (1999) (internal citation omitted).

11  Washington State law has long recognized the special relationship that exists

12  between a jail exercising custodial control and a prisoner without liberty, and thus

13  has imposed upon correctional facilities the requirement to keep a prisoner, "in

14  health and free from harm."  *Gregoire v. City of Oak Harbor*, 170 Wash. 2d 628,

15  635 (2010) (quoting *Kusah v. McCorkle*, 100 Wash. 318, 325 (1918)).  Defendants

16  do not contest that a duty exists to keep inmates safe while in custody but argue

17  that there has been no breach of the duty, and that no action from the correctional

18  facility caused Ms. Nelson's death.  ECF No. 15 at 17–18.

19  The question of whether or not Defendants fell below the standard of care

20  required of the duty imposed is at the heart of this matter, and greatly contested by

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 45

both sides. Plaintiff's expert witnesses are adamant that Defendants provided

substandard care to Ms. Nelson while in custody. ECF Nos. 27 at 7, 28 at 12, and

29 at 29. Defendants' witnesses are equally insistent she was given proper medical

care. ECF No. 17-1 at 7, 19-1 at 6–7, 21 at 8. As such, reasonable minds could

differ as the issue of breach.

      Likewise, causation is fiercely debated by either side, and the crux of the

ultimate question of liability. Cause in fact is the "but for" cause of the injury,

meaning that the event would not have occurred without action from the defendant.

*Taggart v. State*, 118 Wash. 2d 195, 226 (1992). Stated another way, cause in fact

cannot be established if the plaintiff's injury would have occurred without a breach

of duty. *Walker v. Transamerica Title Ins*. Co., 65 Wash. App. 399, 403 (1992).

However, there may be multiple "but for" causes or independent actors may breach

separate duties which together produce an injury. *Meyers v. Ferndale Sch. Dist.*,

12 Wash. App. 2d 254, 264–65 (2020), *aff'd but criticized*, 197 Wash. 2d 281, 481

P.3d 1084 (2021). Legal causation, on the other hand, is a policy consideration

intertwined with the question of duty and decides how far to extend defendant's

responsibility for its actions. *Taggart,* 118 Wash. 2d at 226.

      As was previously discussed, the medical examiner provided three separate

symptoms of chronic alcoholism which could have independently or in some

combination caused the death of Ms. Nelson, and is laid out *supra*, parties disagree

as to what specifically caused her death.  ECF No. 20-5 at 1.  Because reasonable minds could disagree as to the proximate cause of Ms. Nelson's death, whether it be a spontaneous medical episode or caused by some mistreatment of alcohol withdrawal, is ultimately a question for the jury.

Therefore, summary judgment as to the claim of negligence against all three defendants is denied.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants' Motion to Strike (ECF No. 32) is **GRANTED in part.**

2. Defendants' Motion for Summary Judgment (ECF No. 15) is **DENIED.**

The District Court Executive is directed to enter this Order and furnish copies to counsel.

DATED April 19, 2024.



THOMAS O. RICE
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' MOTION TO STRIKE AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 47